UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-252 (NEB/LIB)

| | |
|---|---|
| UNITED STATES OF AMERICA,   )<br>)<br>Plaintiff,   )<br>)<br>v.   )<br>)<br>1. VICTOR MANUEL CALIXTRO-LOYA, and  )<br>)<br>2. ANADELIA PACHECO-RIVERA,   )<br>)<br>Defendant.   ) | GOVERNMENT'S<br>MEMORANDUM IN<br>OPPOSITION TO DEFENSE<br>MOTIONS TO SUPPRESS<br>EVIDENCE |

COMES NOW the United States of America, by and through its undersigned attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Thomas M. Hollenhorst, Assistant United States Attorney, and submits the following memorandum in opposition to the defense motions to suppress the evidence seized from a vehicle occupied by the defendants, Victor Manuel Calixtro-Loya ("Calixtro") and Anadelia Pacheco-Rivera ("Pacheco"). The defense motions should be denied on three grounds. First, Calixtro lacks standing to contest the search. Second, the two-minute extension of the traffic stop to deploy a drug detection dog was permissible in the face of reasonable articulable suspicion the vehicle contained controlled substances. And third, Pacheco consented to the dog sniff, which led to probable cause to conduct a warrantless search of the vehicle.

I. Procedural History

In September 2022, the defendants were jointly charged in the Indictment with conspiracy to distribute methamphetamine (Count 1) in violation of 21 U.S.C.

§§ 841(a)(1), 841(b)(1) and 846, and with possession with the intent to distribute methamphetamine (Count 2) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1). Calixtro was also charged with unlawful reentry after removal (Count 3) in violation of 8 U.S.C. §§ 1326(a)(1) and 1326(b)(1) and 6 U.S.C. §§ 202 and 557. Doc. 1.

In November 2022, the defendants filed three motions to suppress. *See* Doc. 33, 38 and 46.[1] In their joint memorandum, they argue the stop of the vehicle was impermissibly extended and a two-minute delay to conduct a dog sniff was not supported by reasonable articulable suspicion to believe the vehicle contained controlled substances. *See* Doc. 74.

At the motions hearing, the Court admitted the body camera video of Trooper Douglas Rauenhorst from the Minnesota State Patrol. *See* Government Exhibit ("GE") 1. The Court also heard the testimony of Trooper Rauenhorst. The defense called no witnesses, did not offer any exhibits, and presented no evidence to support Calixtro's standing claim.

## II. Statement of Facts

A. Introduction

Trooper Rauenhorst is a sergeant with the Minnesota State Patrol. Motions Hearing Transcript ("Tr.") 11. He is currently assigned as a patrol officer and uses a drug detection dog ("Frizko") in connection with his duties. Tr. 11. He has been a Minnesota

---

[1]. At the motions hearing, the government stated it did not intend to introduce any statements of the defendants made after the issuance of a warning ticket. In response, Calixtro withdrew his motion to suppress statements (Doc. 38).

State Trooper since 1996. Tr. 44. Frizko was trained to detect narcotics, specifically heroin, methamphetamine, cocaine, crack cocaine, psilocybin mushrooms and ecstasy. Tr. 12. Rauenhorst and Frizko participate in 16 hours of training each month. Tr. 12. They are both certified through the North American Police Working Dog Association ("NAPWDA"). Tr. 12. Rauenhorst considers Frizko to be a reliable drug detection dog. Tr. 12, 36. Frizko "alerts" by "sniffing intensely and going toward the odor." Tr. 13, 36. The manner by which Frizko "indicates" is to "sit and stare at the source odor of the drugs." Tr. 13, 36.

On July 19, 2022, Rauenhorst was on patrol duty near mile post 175 on Interstate 94 ("I-94") in Stearns County, Minnesota. Tr. 13-14. He saw a Toyota Corolla traveling eastbound on I-94, while he was traveling westbound. Tr. 13-14. He noted the vehicle appeared to be traveling faster than the posted 70 mile-per-hour speed limit. Tr. 14. He slowed down to use a "crossover" to turn from the westbound lane to the eastbound lane of I-94. Tr. 14-15, 39. As he did so, he saw another trooper parked on the south shoulder (right shoulder) of the eastbound lane who was processing a traffic stop of his own. Tr. 14, 39-40.[2] Rauenhorst saw the driver of the Toyota "looking back towards the trooper as the vehicle passed me." Tr. 14, 41. He found this to be suspicious:

> Lot[s] of the times when I see people passing . . . they're looking forward or will just do a quick head snap over, or if they see me in the median, sometimes people wave. And this time the driver was looking straight back, almost over the shoulder, back at the trooper's squad, where the trooper was.

---

2. At one point, Rauenhorst stated the trooper's vehicle was facing westbound, but he later corrected himself. Tr. 39-40.

3

Tr. 15.

After Rauenhorst entered the eastbound lane of I-94, he caught up with the Toyota, activated his emergency lights, and stopped it at about 9:50 a.m. Tr. 15, 40; GE 1 (09:49:58). He noted something unusual about the stop. Tr. 15-16. As he approached the vehicle, the right turn signal remained activated. Tr. 16, 41-42. To him, this was an indication the driver was nervous, not paying attention, and had her mind on something else. Tr. 16. He noted most drivers will turn their signals off when they hear it going "click, click, click . . . ." Tr. 16, 42. In fact, he testified "most everyone I've stopped turns the turn signal off." Tr. 16. Rauenhorst also found it unusual the gearshift of the vehicle was not in park after the stop. Tr. 32. He testified this too was an indication of the driver "[b]eing nervous [and] not being able to remember what she was doing . . . ." Tr. 32.

When Rauenhorst was standing near the front passenger window, he engaged in conversation with Pacheco, who was the driver. Tr. 17; GE 1 (09:50:20 to 09:51:55).[3] He told her he had stopped her for speeding. Tr. 17. Calixtro was sitting in the right front passenger seat. Tr. 18.[4] Rauenhorst asked Pacheco about insurance for the Toyota. Tr. 19. She responded the Toyota was her son's vehicle, whom she identified as

---

3. Rauenhorst testified he believed Pacheco was able to understand English "because she responded to me." Tr. 44. He remembers her to be "giggling or laughing a little bit, but she responded." Tr. 44.

4. During the stop, Rauenhorst did not determine the relationship between Pacheco and Calixtro or the reason he was even in the vehicle. Tr. 58-59.

4

"Miguel." Tr. 19. Rauenhorst looked at the insurance document provided by Pacheco and it matched the name she provided. Tr. 19. During the brief conversation that followed, Rauenhorst noticed there was a dog in the back seat of the Toyota and a bag of dog food. Tr. 19. Later, he noticed there was also another smaller dog in the back seat. Tr. 19, 43. He did not see any luggage. Tr. 19. He asked Pacheco if she had permission to drive the Toyota and she said she did. Tr. 20. Calixtro said very little, but may have said "Minneapolis" at one point. Tr. 20. Pacheco said she was going to Minneapolis and then, after some hesitation, she said she was going to Bloomington and the Mall of America. Tr. 20-21. Rauenhorst found this to be suspicious because when most people are asked where they are going their response is more "to the point." Tr. 21.[5]

Rauenhorst also found it suspicious Pacheco would be going to the Mall of America with a dog in the back seat. Tr. 21-22, 45. He testified stores there do not allow dogs and one would not leave a dog in the car on such a hot day. Tr. 22. Rauenhorst testified the outside temperature was "approximately 95 degrees that day." Tr. 22.[6]

Pacheco said she lived in Oregon and the trip (which Rauenhorst assumed had begun in Oregon) was going to last three days. Tr. 22-23, 45, 57. Rauenhorst found this to be unusual "because a lot of times if people travel across country it will be usually more than

---

5. Rauenhorst conceded on cross-examination that people unfamiliar with the area may describe the Mall of America as being in the Twin Cities or in Minneapolis. Tr. 56-57.

6. Historical temperature readings for Bloomington confirm the day was a hot one. *See* https://www.wunderground.com/history/daily/us/mn/bloomington/KMSP/date/2022-7-19.

a few days." Tr. 23. He also found it unusual there was no luggage in the back seat. Tr. 23, 43. He testified, "[m]ost people I stop driving across the country will have luggage, and this is . . . a small car . . . ." Tr. 23. He added on cross-examination that most of the people he stopped on the interstate who were traveling cross-country "have larger bags for legitimate trips." Tr. 55. Rauenhorst also testified he knew the west coast of the United States was a source location for drugs and the Twin Cities area has a high demand for these drugs. Tr. 33-34, 59.

Rauenhorst noticed something else unusual. Tr. 23-24. There was a single key in the ignition. Tr. 24. As Rauenhorst testified:

> Because motor vehicles I've stopped in the past with drug loads in hidden compartments, the vehicles are only used to transport drugs. A lot of times the drivers are driving the drugs across country. They have no other ties to the vehicle. Their house keys, everything else is on their regular key chain with the keys -- the vehicle they usually use. There's no house keys, no anything. Just the ignition key on the ignition.

Tr. 24. In other words, Rauenhorst testified that when someone has only an ignition key and no other keys, it "[i]ndicates to me that [the] person[²] [i]s not using [the vehicle] for everyday use." Tr. 25. Rauenhorst also noticed the presence of three cellphones. Tr. 25. One was mounted on [the dash of] the windshield and appeared to be in use as a GPS navigational aid. Tr. 25. He saw two others in the hands of Calixtro when he first approached the Toyota. Tr. 25.

After his initial conversation with Pacheco, Rauenhorst went back to his squad car to verify the registration for the Toyota and Pacheco's driver's license. Tr. 26, 42; GE 1 (09:52:08 to 10:03:58). This check revealed the Toyota was not registered to "Miguel" as

6

Pacheco had said. Tr. 26. In fact, it came back to "Carlos Eduardo Tejada" with no apparent link to Pacheco. Tr. 26-27. The insurance (as reflected by the vehicle registration) showed the Toyota had valid insurance. Tr. 26, 42. Also, the check revealed the Toyota had not been reported stolen and Pacheco's driver's license was valid. Tr. 42-43.

Rauenhorst decided to issue Pacheco a warning ticket for speeding, which he printed out on his police console. Tr. 27, 46; GE 1 (10:03:58). Just over 14 minutes after the traffic stop had begun, Rauenhorst walked back to the passenger side of the Toyota with the warning ticket and Pacheco's driver's license. Tr. 27; GE 1 (10:04:40). He gave the warning ticket and license to Pacheco, simultaneously asking if "there was anything illegal inside the vehicle or drugs." Tr. 28, 31; GE 1 (10:04:53).[7] Pacheco responded negatively. Tr. 28. This was quickly followed by Rauenhorst asking if he could run his drug dog around the vehicle, to which Pacheco responded either "okay" or "yes" accompanied with "like a head nod." Tr. 28-29, 47; GE 1 (10:04:56).[8] Rauenhorst interpreted this to mean Pacheco had consented to a dog sniff. Tr. 28-29.[9] Rauenhorst

---

7. Rauenhorst's exact words were: "Before you go, do you have anything illegal in the car at all, do ya, no drugs or anything like that?" GE 1 (10:04:53).

8. Again, Rauenhorst's exact words were: "Is it okay if I run my canine around the car here quick . . . my drug dog." GE 1 (10:04:56). He then stated "okay" in response to an inaudible response by Pacheco. GE 1 (10:05:01).

9. On cross-examination, Rauenhorst acknowledged that his police report omitted any reference to Pacheco's consent and that he did not remember his exact words. Tr. 49.

7

then asked the defendants to get out of the Toyota, which they did.   Tr. 28-30, 49-50; GE 1 (10:05:27).

After the defendants got out of the Toyota, they waited in the service ditch while Rauenhorst ran Frizko around the vehicle.   Tr. 30.   Frizko alerted to the presence of narcotics near the rear underside of the Toyota.   Tr. 30, 37; GE 1 (10:06:58).   At that point, Rauenhorst determined he had probable cause to search the vehicle.   Tr. 31.   He also determined the defendants were no longer free to leave.   Tr. 66.

Rauenhorst, accompanied by other police officers, then conducted an initial search of the Toyota, but did not find any drugs.   Tr. 50-51, 61-64; GE 1 (10:07:44 to 10:43:21).   The roadside search lasted about 35 minutes, some of which time the defendants were seated in a squad car.   Tr. 60.   During the search, Rauenhorst noted there was a "small amount" of luggage in the trunk of the Toyota.   Tr. 43-44.   The police conducted a more thorough search of the Toyota after towing it to the Clearwater Fire Department, where they removed the front seats and discovered approximately 70 packages of suspected methamphetamine concealed in compartments under the floorboard.   Tr. 51-53, 64-69.   The search occurred approximately one hour after Frizko had alerted and about 20 minutes after Rauenhorst had arrived at the fire station.   Tr. 68; *see* GE 1 (depicting arrival of Rauenhorst at the fire station at about 10:47:54).

### III.   Argument

A.   Calixtro Has No Standing to Contest the Search

The law of standing, as it pertains to automobile searches, is best described by the Eighth Circuit in *United States v. Russell*:

> Fourth Amendment rights are personal rights that may not be asserted vicariously. An individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search. If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally. Factors relevant to standing include: ownership, possession and/or control of the area search or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case. *Generally, a mere passenger does not have standing to challenge a vehicle search where he has neither a property nor a possessory interest in the automobile.*

847 F.3d 616, 618 (8th Cir. 2017) (cleaned up) (emphasis added).

Calixtro was merely a passenger in the Toyota at the time of the traffic stop. Moreover, the vehicle was neither owned nor operated by him. In fact, Calixtro provided no evidence to support a finding he had even a possessory interest in the vehicle. *See Russell*, 847 F.3d at 619 ("Russell provides no evidence that his girlfriend permitted him to drive the sedan or otherwise exercise any possessory control over it."); *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995) (A "defendant must present at least some evidence of consent or permission from the lawful owner/renter [of a vehicle] to give rise to an objectively reasonable expectation of privacy."); *United States v. Macklin*, 902 F.2d 1320, 1330 (8th Cir. 1990) ("[T]o have a legitimate expectation of privacy by way of a possessory interest, defendant must have possession of the vehicle and the keys.") (citing *United States v. Rose*, 731 F.2d 1337, 1343 (8th Cir. 1984)).

Importantly, Calixtro has never asserted he had either a subjective or objective expectation of privacy in the Toyota. While it is probable Calixtro accompanied Pacheco from Oregon to Minnesota and may have even driven part of the way, this is not enough to meet his burden of proving standing. The caselaw provides strong support for the proposition that even though a defendant may have driven a particular vehicle in the past, it does not confer standing to contest a subsequent search where the defendant was merely a passenger. *See United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) ("[E]ven if Anguiano had driven the vehicle himself at some point, he provided no evidence of consent or permission from the vehicle's lawful owner.") (citing *Muhammad*, 58 F.3d 354 (holding a defendant needs to make some affirmative showing of consensual possession to satisfy the standing requirements)); *United States v. Jefferson*, 925 F.2d 1242, 1249-51 (10th Cir. 1991) (holding passenger in vehicle lacked standing to challenge the automobile search even though he shared driving responsibilities during a long-distance trip).

The case of *United States v. Eylicio-Montoya*, 70 F.3d 1158 (10th Cir. 1995) is illustrative. The defendant, Eylicio-Montoya, offered evidence from her son, Joe Eylicio, that even though she was a passenger in a vehicle at the time of a traffic stop, she had been allowed to drive the vehicle in the past. *Id.* at 1162. In reversing the district court's conclusion that the Eylicio-Montoya had standing to contest the search of the vehicle, the Tenth Circuit held that "[s]uch prior control of a vehicle is insufficient to establish a passenger's standing to directly challenge a search." *Id.* As such, the defendant has failed to meet his burden of establishing he had standing to contest the search of the vehicle.

### B. The Search of the Toyota Was Reasonable

The Court has addressed numerous vehicle stop cases in the past and will, undoubtedly, address many more in the future. The issues presented usually involve one or more of the following issues: (1) Was the initial stop reasonable; (2) did the vehicle owner, driver or other authorized passenger give consent for the police to search the vehicle or to conduct a dog sniff; (3) was the traffic stop extended in the absence of reasonable articulable suspicion; and (4) did law enforcement have reasonable articulable suspicion to justify an extension of the traffic stop? In this case, the defendants apparently concede the traffic stop was reasonable. *See* Doc. 74 at 7 ("the Defendants take no issue with the Trooper's ability to process a warning for a minor traffic violation . . . ."). As will be seen, the so-called extension of the stop was justified on two independent grounds. First, the police had reasonable articulable suspicion to extend the stop for the brief time to deploy a drug detection dog. Second, Pacheco consented to the dog sniff.

### 1. *General Principles*

During a traffic stop, a law enforcement officer is "entitled to conduct an investigation reasonably related in scope to the circumstances that justified the interference in the first place.'" *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) (citation omitted). Such "investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Willis*, 967 F.2d 1220, 1224 (8th Cir. 1992) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). A traffic

11

stop may last no longer than is necessary "to address the traffic violation that warranted the stop" and "attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)

A traffic stop may be extended if there is a permissible basis for doing so at the time of its extension. One such example, is when an officer develops reasonable articulable suspicion criminal activity is afoot. *See, e.g., United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021) (citations omitted) ("An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered."). Circumstances that may give rise to reasonable suspicion to extend a traffic stop include: "(1) unusual driving behavior, (2) attempts to evade officers, (3) indirect or incomplete answers to officer questions, (4) nervousness and lack of eye contact, and (5) seeming implausibilities and inconsistencies in the responses to [an officer's] routine questions about travel plans." *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021) (cleaned up).

Courts consider "the totality of the circumstances when determining whether an officer has a particularized and objective basis to suspect wrongdoing." *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir. 2012). "This analysis requires courts to consider that officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "Law enforcement officers are entitled to evaluate the totality of the circumstances . . . and they may possess reasonable suspicion even when innocent

12

explanations can be put forward for each individual circumstance." *United States v. Reddick*, 910 F.3d 358, 961 (8th Cir. 2018). The totality of the circumstances must be viewed "in light of the officer's experience." *Id.* (quoting *United States v. Dodson*, 109 F.3d 486, 488 (8th Cir. 1997)). "Police officers are not required to ignore their reasonable suspicions. Rather, they are permitted to graduate their responses to the demands of any particular situation." *United States v. McCarty*, 612 F.3d 1020, 1025 (8th Cir. 2010) (quoting *United States v. Pereira-Muñoz*, 59 F.3d 788, 791 (8th Cir. 1995)). It is well settled that although "each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed together." *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002) (citing *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994)).

A search of a vehicle is also justified when the driver gives consent. The government bears the burden of proving consent was freely and voluntarily given. *See Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). "Voluntariness is a question of fact to be determined from all the circumstances," *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973), which the Eighth Circuit reviews for clear error. *United States v. LeBeau*, 867 F.3d 960, 970 (8th Cir. 2017) (citation omitted).

> 2. *The Police Had Reasonable Articulable Suspicion Criminal Activity Was Afoot*

As Rauenhorst testified, during the course of his brief traffic stop, he became suspicious the defendants were engaged in unlawful activities, specifically, the transportation of controlled substances from Oregon to Minnesota. His suspicions were

13

aroused at the very start. First, he noticed that as Pacheco passed another squad car while speeding eastbound on I-94, she looked back in an unusual manner, almost over her shoulder. Then, when he approached the vehicle, the turn signal was still on and the gearshift of the vehicle had not been placed in park. This indicated to Rauenhorst, a very experienced police officer with years of experience, that Pacheco was unusually nervous, not paying attention, and had something else on her mind. His suspicions were confirmed by a number of other factors: (1) Pacheco stated the Toyota belonged to her son when, in fact, Rauenhorst determined it was registered to another person seemingly unrelated to Pacheco; (2) Pacheco was evasive about her destination, first saying she was going to Minneapolis and then, after some hesitation, to Bloomington and the Mall of America; (3) Pacheco had two dogs in the Toyota, which was inconsistent with a person who planned to visit a busy shopping center on a hot day where dogs were not permitted; (4) Pacheco had only the ignition key to the vehicle unlike most people who keep a variety of keys on their key chains, leading to a reasonable inference Pacheco had only a passing connection to the vehicle; (5) despite a long trip from Oregon in a small car, the occupants had no luggage in the back seat; (6) Pacheco said the trip would last three days, which Rauenhorst concluded was inconsistent with a person traveling cross-country for legitimate purposes; (7) the west coast is a source location for drugs and the Twin Cities area has a high demand for these drugs; and (8) Calixtro had two cellphones in his lap and a third cellphone was on the dash of the car.

Under these facts, the brief two-minute extension of the traffic stop for Rauenhorst to deploy Frizko to sniff the exterior of the Toyota was reasonable. *United States v.*

*Pulido-Ayala*, 892 F.3d 315, 318 (8th Cir. 2018) ("The use of [a] drug-sniffing dog on the exterior of a vehicle during a valid traffic stop is not a search and does not infringe upon any Fourth Amendment rights.") (internal quotation marks and alteration omitted).   Once the dog alerted, the police had probable cause to search the vehicle without the necessity of a warrant.   *United States v. Hines*, 62 F.4th 1087 (8th Cir. 2023) ("Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present.") (citing *United States v. Bowman*, 660 F.3d 338, 345 (8th Cir. 2011); U*nited States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007)); *see also United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir. 2006) ("Because the dog sniff was legal, the resulting search of [defendant's] car was also legal, for the dog's identification of drugs in [defendant's] car provided probable cause that drugs were present, which entitled the officers to search the vehicle forthwith pursuant to the automobile exception to the warrant requirement.") (citing *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005)).   Moreover, the police did so within a reasonable time, that is, within about an hour of the time Frizko alerted.[10]

---

10.   That the police transported the vehicle to a fire station, and arguably caused some damage to it during the search, does not defeat the reasonableness of the search. *See generally United State v. Villegas*, No. 4:05-CR-00177, 2006 WL 335444, *5 (S.D. Iowa Feb. 13, 2006); *United States v. Spaid*, No. 3:16-CR-30176-RAL, 2017 WL 9292373, *7 (D.S.D. Sept. 20, 2017) ("There is no temporal limit to the exception; a warrantless search need not occur contemporaneously with a vehicle's initial seizure.   If officers have probable cause to search the vehicle in the first instance, then they can search it again later on—especially where, as here, the delay in doing so is minimal (just over an hour).").

The defendants argue that Rauenhorst should have asked follow-up questions, which would have abated reasonable articulable suspicion. Yet, the defendants cite no authority for the proposition that a police officer is required to ask such questions. If fact, had Rauenhorst engaged in extended questioning of the defendants, the defense would likely now be arguing such questioning exceeded the scope of the traffic stop. Rauenhorst asked short, concise and reasonable open-ended questions and received responses that ever-increased his suspicions that criminal activity was afoot.

The defendants also rely on evidence obtained during the initial roadside search, such as luggage in the trunk, to try to negate a finding of reasonable articulable suspicion. Yet, the Court's analysis must focus on what was known to Rauenhorst before the search commenced. Clearly, the government cannot rely on the presence of 70 packages of suspected methamphetamine in the vehicle to support reasonable articulable suspicion. So too, the defendants cannot rely on evidence found during the search in support of their argument.

### 3. Pacheco Consented to the Dog Sniff

The search of the vehicle was also justified by Pacheco's consent to a dog sniff as the traffic stop was coming to a close. Pacheco gave her consent simultaneously with the issuance of the warning ticket. In fact, no more than a few seconds passed from the time Rauenhorst handed Pacheco the ticket through the passenger side window until the time Rauenhorst received confirmation she had consented to the dog sniff. *Cf. United States v. Mathes*, 58 F.4th 990, 993 (8th Cir. 2023) (finding that where permission to search required only a couple of seconds it did not unreasonably prolong the traffic stop). Again, once

16

Frizko alerted, a further one-hour delay to fully search the vehicle was not unreasonable.

WHEREFORE, the government asks this Honorable Court to deny the defendant's motions to suppress.

Dated: April 19, 2023                    Respectfully submitted,

                                         ANDREW M. LUGER
                                         United States Attorney

                                         s/*Thomas M. Hollenhorst*

                                         BY: THOMAS M. HOLLENHORST
                                         Assistant United States Attorney
                                         Attorney ID No. 46322