# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-cr-252 (NEB/LIB) |
| Plaintiff, | |
| v. | **ORDER AND**<br>**REPORT AND RECOMMENDATION** |
| Victor Manuel Calixtro-Loya (1),<br>Anadelia Pacheco-Rivera (2), | |
| Defendants. | |

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon the parties' various Motions for the discovery and production of evidence, [Docket Nos. 5, 34, 35, 36, 37, 42, 43, 44, 45], and Defendant Victor Manuel Calixtro-Loya's ("Defendant Calixtro-Loya") Motion to Suppress Evidence from Illegal Search and Seizure, [Docket No. 33], as well as, Defendant Anadelia Pacheco-Rivera's ("Defendant Pacheco-Rivera") Motion to Suppress Evidence from Illegal Search and Seizure. [Docket No. 46].[1]

For the reasons discussed herein, the Government's Motion for Discovery, [Docket No. 5], and Defendants Calixtro-Loya and Pacheco-Rivera's Motions to Retain Rough Notes, [Docket Nos. 35, 45]; and Motions for Disclosure of Rule 404(b) Evidence, [Docket No. 37, 43], are **GRANTED** as set forth herein. Further, Defendants Calixtro-Loya and Pacheco-Rivera's Motions for Discovery, [Docket No. 36, 42], are **GRANTED, in part, and DENIED, in part**, as set forth herein. However, Defendants Calixtro-Loya and Pacheco-Rivera's Motions for Disclosure of Early Jencks Act Material, [Docket Nos. 34, 44], are **DENIED** as set forth herein.

---

[1] Based on the representations of the parties at the February 16, 2023, Motions Hearing and for the reasons stated on the record, Defendant Calixtro-Loya's Motion to Suppress Unmirandized Statements, [Docket No. 38], was termed as moot.

Further, it is recommended that Defendant Calixtro-Loya's Motion to Suppress Evidence from Illegal Search and Seizure, [Docket No. 33], be **DENIED**, and that Defendant Pacheco-Rivera's Motion to Suppress Evidence from Illegal Search and Seizure, [Docket No. 46], be **DENIED** as well.[2]

## I.    Background

Defendant Victor Manuel Calixtro-Loya is charged with one (1) count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846, one (1) count of aiding and abetting possession with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, as well as, one count of unlawful reentry after removal in violation of 8 U.S.C. §§ 1326(a)(1), 1326(b)(1), and 6 U.S.C. §§ 202, 557. (Indictment, [Docket No. 1]). Defendant Anadelia Pacheco-Rivera is charged with one (1) count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and one (1) count of aiding and abetting possession with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  (Id.).

## II.    Government's Motion for Discovery for Defendants Calixtro-Loya and Pacheco-Rivera. [Docket No. 5].

The Government seeks discovery from Defendant Calixtro-Loya and Defendant Pacheco-Rivera, pursuant to Rules 16(b), 12.1, 12.2, 12.3, and 26.2 of the Federal Rules of Criminal Procedure, as well as, Rules 702, 703, and 705 of the Federal Rules of Evidence. (See Gov't's Mot. for Discovery, [Docket No. 5]).

---

[2] The parties requested supplemental briefing on the motions to suppress.  That request was granted, and after the briefs were filed, all motions were taken under advisement on April 20, 2023.

### A.  Inspection and Copying Pursuant to Rule 16(b)

#### 1.  Documents and Tangible Objects

The Government requests that the Court order Defendants Calixtro-Loya and Pacheco-Rivera to permit inspection and copying of all books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of Defendants and which Defendants intend to introduce as evidence in their case-in-chief at trial.

Defendants did not object to the request. The motion is granted, and Defendants Calixtro-Loya and Pacheco-Rivera shall disclose any such responsive materials no later than fourteen (14) days before trial.

#### 2.  Reports of Examinations and Tests

The Government further requests from Defendants Calixtro-Loya and Pacheco-Rivera all results and reports of physical or mental examinations and of scientific tests or experiments made in connection with the above captioned matter, or copies thereof, within the possession or control of Defendants, which Defendants intend to introduce as evidence in their case-in-chief at trial or which were prepared by a witness whom Defendants intend to call at trial.

Defendants did not object to the request. The motion is granted, and Defendants Calixtro-Loya and Pacheco-Rivera shall disclose any such responsive materials no later than fourteen (14) days before trial.

#### 3.  Expert Testimony

The Government also seeks a written summary of expert testimony Defendants Calixtro-Loya and Pacheco-Rivera intend to use under Rule 702, 703, and 705 of the Federal Rules of Evidence as evidence at trial.  The Government asserts that the summary must describe the opinions of the expert witnesses, the basis and reasons therefore, and the witnesses' qualifications.

The Government requests that such expert disclosures for both parties be made thirty (30) days before trial with rebuttal expert reports being produced no later than ten (10) days before trial.

Defendants did not object to the request. The motion is granted, and Defendants Calixtro-Loya and Pacheco-Rivera shall disclose any such responsive materials for experts they intend to call in their defense case-in-chief at trial no later than thirty (30) days before trial.  Defendants shall also disclose any such responsive materials related to expert reports in rebuttal to any case-in-chief experts disclosed by the Government no later than ten (10) days before trial.[3]

### B.  Notice of Alibi Defense

Pursuant to Federal Rule of Criminal Procedure 12.1, the Government seeks an Order from the Court requiring Defendants Calixtro-Loya and Pacheco-Rivera, if they intend to claim alibi as a defense, to notify the Government no later than the date of the Motions hearing.  The Government also requests that the notice state the specific place or places at which Defendants claim to have been at the time of the alleged offenses in the above captioned matter and the names and addresses of the witnesses upon whom Defendants intend to rely to establish such alibi.

Defendants did not object to this request. The motion is granted, and Defendants Calixtro-Loya and Pacheco-Rivera shall give notice of same pursuant to Rule 12.1 as soon as practicable and in no event later than twenty-one (21) days before trial.

### C.  Notice of Insanity/Mental Illness Defense

In addition, pursuant to Federal Rule of Criminal Procedure 12.2, the Government requests the Court to order Defendants Calixtro-Loya and Pacheco-Rivera, if they intend to rely upon the defense of insanity or introduce expert testimony relating to a mental disease or defect or any other

---

[3] The Government's request for expert disclosures sought reciprocal production by both sides.  Accordingly, the Government shall make disclosures under Rule 16(a)(1)(G) on this same schedule as well.

mental condition of Defendants relevant to the issue of guilt, to provide the Government notice of such defense no later than the date of the Motions hearing.

Defendants did not object to this request. The motion is granted, and Defendants Calixtro-Loya and Pacheco-Rivera shall give notice of same pursuant to Rule 12.2 as soon as practicable and in no event later than twenty-one (21) days before trial.

### D.  Notice of Public Authority

Pursuant to Federal Rule of Criminal Procedure 12.3, the Government seeks an order from the Court requiring Defendants Calixtro-Loya and Pacheco-Rivera, if they intend to rely upon the defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the offense, to notify the Government and the Court no later than the date of the first hearing on pretrial motions.

Defendants did not object to this request.  The motion is granted, and Defendants Calixtro-Loya and Pacheco-Rivera shall give notice of same pursuant to Federal Rule of Criminal Procedure 12.3 as soon as practicable and in no event later than twenty-one (21) days before trial.

### E.  Witness Statements

The Government seeks all statements within Defendant Calixtro-Loya and Pacheco-Rivera's possession or control of any witness that Defendants intend to call in connection with a suppression hearing, detention hearing, trial, or sentencing.

Defendants did not object to this request.  The motion is granted.  To the extent Defendants Calixtro-Loya and Pacheco-Rivera's have statements in their possession or control of any witness that they intend to call to testify in connection with pretrial motions hearings, trial, or sentencing, Defendants shall disclose such statements to the Government no later than three (3) days before such witness is called to testify.

**III.    Defendant Calixtro-Loya's Motion for Early Disclosure of Jencks Act Materials, [Docket No. 34], and Defendant Pacheco-Rivera's Motion for Early Disclosure of Jencks Act Materials. [Docket No. 44].**

Defendants Calixtro-Loya and Pacheco-Rivera both move the Court for an Order requiring the Government to disclose Jencks Act materials "as early as the Court deems appropriate." (See Def. Calixtro-Loya's Mot. for Early Disclosure of Jencks Act Material, [Docket No. 34]; Def. Pacheco-Rivera's Mot. for Early Disclosure of Jencks Act Material, [Docket No. 44]).

The Government objects to Defendants' motion arguing that it cannot be <u>required</u> to make pretrial disclosure of Jencks Act materials before a witness has testified. (See Gov't's Response to Defendants' Pretrial Motions, [Docket No. 51], at pp. 2-4).

The Court recognizes the practical effect that disclosing Jencks Act materials only after a witness has actually testified in the Government's case-in-chief creates the prospect for unnecessary continuances and delays in the trial while the Defense is permitted a reasonable time to review the late disclosures. However, Defendants provide no citation to any recent authority which would allow the Court to <u>require</u> early disclosure of Jencks Act material. Generally, the case law provides that the Court may not require the Government to make early disclosure of Jencks Act material. <u>See, e.g.</u>, <u>United States v. Alexander</u>, 736 F. Supp. 968, 981 (D. Minn. 1990); <u>United States v. White</u>, 750 F.2d 726, 727 (8th Cir. 1984); <u>United States v. Wilson</u>, 102 F.3d 968, 971–72 (8th Cir. 1996).

Accordingly, Defendant Calixtro-Loya and Defendant Pacheco-Rivera's Motions for Early Disclosure of Jencks Act Material, [Docket Nos. 34, 44], are denied.[4]

---

[4] Nevertheless, in its written response, the Government voluntarily agreed to provide all Jencks Act materials to the Defense by no later three (3) business days before trial. The Court encourages such voluntarily agreements.

**IV.    Defendant Calixtro-Loya's Motion to Retain Rough Notes, [Docket No. 35], and Defendant Pacheco-Rivera's Motion to Retain Rough Notes. [Docket No. 45].**

Defendant Calixtro-Loya and Defendant Pacheco-Rivera both request an Order from the Court requiring any law enforcement agent, including confidential informant, to retain and preserve all rough notes taken as part of their investigations, whether or not the contents of such rough notes are incorporated in official records.  (See Def. Calixtro-Loya's Mot. to Retain Rough Notes, [Docket No. 35]; Def. Pacheco-Rivera's Mot. to Retain Rough Notes, [Docket No. 45]).

The Government does not object to Defendants' request for the retention of rough notes. (See Gov't's Response to Defendants' Pretrial Motions, [Docket No. 51], at pp. 2-4).

Defendant Calixtro-Loya and Defendant Pacheco-Rivera's motions are granted regarding rough notes as to retention only at this time.  If Defendants seek production or disclosure of rough notes, they will need to bring a separate motion for such production.

**V.    Defendant Calixtro-Loya's Motion for Discovery, [Docket No. 36], and Defendant Pacheco-Rivera's Motion for Discovery. [Docket No. 42].**

Defendants Calixtro-Loya and Pacheco-Rivera seek disclosure of any written, recorded, or oral statements made by Defendants or copies thereof in the possession, custody, or control of the Government; the substance of any oral statements made by Defendants or co-defendants, whether before or after arrest, which the Government intends to offer in evidence at the trial; as well as, a copy of their entire criminal history.  (Def. Calixtro-Loya's Mot. for Discovery, [Docket No. 36]; Def. Pacheco-Rivera's Mot. for Discovery, [Docket No. 42]).  Defendant Pacheco-Rivera requests the names of each officer present at the time the requested statements were made.  (Def. Calixtro-Loya's Mot. for Discovery, [Docket No. 36]).

Furthermore, Defendants both request permission to inspect and/or copy books, papers, documents, photographs, and tangible objects in the possession, custody, or control of the Government and which are material to the preparation of the defense or are intended for use by

the Government as evidence in chief at the trial or were obtained from or belonged to Defendants. (Def. Calixtro-Loya's Mot. for Discovery, [Docket No. 36]; Def. Pacheco-Rivera's Mot. for Discovery, [Docket No. 42]). They also request all video and audio recordings of Defendants and accomplices taken from any retail business involved in the alleged conspiracy, including footage taken from surveillance cameras or traffic cameras featuring Defendants. (Id.).

Defendants also request copies of all statements made by witnesses in this case, whether or not the Government intends to call them at trial, at least thirty (30) days before trial; as well as, a copy of the criminal record for each witness the Government intends to call at trial.

They also seek all records relating to promises made or compensation furnished to any government witness, confidential informant, or person acting on behalf of the government in connection with this case in exchange for testimony or assistance with prosecuting the case; information relating to identification and identification procedures used to identify Defendants in this case, including information as to the person making the identification, information about other individuals used in photo lineups, and copies of photographs or videos used to make identification; all documents relating to the Government's claims for forfeiture of motor vehicles and real property; and all documents relating to the training and service history of each and every drug sniff dog employed by law enforcement in this case, which includes any reports relating to searches resulting in suppressed evidence due to problems with the dog sniff search, either because of the handler or the animal.

Defendants both also request permission to access test results to Ion scans conducted in the various searches associated with this case, the analysis of the scans, and forensic testing of items obtained from trash pulls.

In its written response to Defendant Calixtro-Loya and Defendant Pacheco-Rivera's Motions, the Government asserted that it has and would continue to comply with its obligations

under Rule 16.  (<u>See</u> Gov't's Response to Defendants' Pretrial Motions, [Docket No. 51], at pp. 2-4).

It is well established that "[c]riminal defendants do not have a general constitutional right to discovery." <u>United States v. Johnson</u>, 228 F.3d 920, 924 (8th Cir. 2000) (citing <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977)). "In most circumstances, then, a defendant must point to a statute, rule of criminal procedure, or other entitlement to obtain discovery from the government." <u>Id.</u>

Here, to the extent Defendants seek: 1) copies of all witness statements, whether or not the Government intends to call these witnesses at trial; and 2) all records relating to promises made or compensation furnished to any government witness, confidential informant, or person acting on behalf of the government in connection with this case in exchange for testimony or assistance with prosecuting the case, Defendants have not provided this Court with any authority that would entitle them to discovery at this time.[5]  Indeed, no such authority exists pursuant to Federal Rule of Criminal Procedure 16.  Federal Rule of Criminal Procedure requires the Government to disclose, among other things, relevant written or recorded statements or confessions made by Defendant; relevant results or reports of physical or mental examinations; and documents within the Government's possession, custody, or control that is material to preparing the defense, will be used by the Government in its case-in-chief, or documents obtained from or belonging to Defendant. <u>See</u> Fed. R. Crim. P. 16(a).  Therefore, Defendants are not entitled to this requested discovery.

Furthermore, to the extent Defendants seek information related to identification and identification procedures used to identify them, the Government has not identified the use of any photo lineups in this case.

---

[5] However, to the extent such requested discovery is covered by Defendant's other pretrial Motions, such discovery is best addressed by the Court, <u>infra</u>.

Accordingly, Defendant Calixtro-Loya and Defendant Pacheco-Rivera's Motions for Discovery, [Docket Nos. 36, 42], are granted, in part, as to any subsequently acquired materials or information which are specifically responsive to Rule 16(a)(1)(A)-16(a)(1)(E), which shall be disclosed to the Defense as soon as said responsive materials for use in trial are discovered by the Government and in any event by no later than fourteen (14) days before trial. As for expert testing under Rule 16(a)(1)(F) and testimony under Rule 16(a)(1)(G), the parties must disclose the identity of any expert witness and make all expert disclosures to be used in their case-in-chief as required by Federal Rule of Criminal Procedure 16 no later than thirty (30) days before trial. The parties must disclose the identity of any expert who will testify in rebuttal of a disclosed case-in-chief expert witness and make all disclosures as to such expert required by Federal Rule of Criminal Procedure 16 no later than ten (10) days before trial. Defendant Calixtro-Loya and Defendant Pacheco-Rivera's Motions for Discovery, [Docket Nos. 36, 42], are otherwise denied, in part, to the extent they seek discovery which would require disclosure at this time beyond <u>Brady</u>, <u>Giglio</u>, and Rule 16.

## VI.    Defendant Calixtro-Loya's Motion for Disclosure of Rule 404(b) Evidence, [Docket No. 37], and Defendant Pacheco-Rivera's Motion for Disclosure of Rule 404(b) Evidence. [Docket No. 43].

Defendant Calixtro-Loya and Defendant Pacheco-Rivera both seek disclosure of any "bad act" or "similar course of conduct" evidence that the Government intends to offer at trial pursuant to Federal Rule of Evidence 404(b). (<u>See</u> Def. Calixtro-Loya's Mot. for Disclosure of Rule 404(b) Evidence, [Docket No. 37]; Def. Pacheco-Rivera's Mot. for Disclosure of Rule 404(b) Evidence, [Docket No. 43]).

In its written response to both motions, acknowledging its obligation to comply with Rules 404(b), the Government has represented that it will continue to comply with its obligations and

will disclose any Rule 404(b) evidence within three (3) weeks of trial. (See Gov't's Response to Defendants' Pretrial Motions, [Docket No. 51], at pp. 2-4).

In relevant part, Rule 404(b)(3) provides that the Government must "provide reasonable notice of any" Rule 404(b) "evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A). In that notice, the Government must also "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B).

Defendant Calixtro-Loya and Defendant Pacheco-Rivera's Motions for Disclosure of Rule 404(b) Evidence, [Docket Nos. 37, 43], are granted, as set forth herein. The Court orders the Government to disclose to the Defense as soon as practicable, and in no event later than twenty-one (21) days before trial, formal notice of any specific 404(b) evidence it intends to offer, as well as, the purpose for which it intends to offer it into evidence at trial.[6]

## VII.    Defendants Calixtro-Loya and Pacheco-Rivera's Motions to Suppress Evidence from Illegal Search and Seizure.  [Docket Nos. 33, 46].

Defendants Calixtro-Loya and Pacheco-Rivera both move the Court for an Order suppressing all evidence obtained from the search of a black Toyota Corolla, which was subject to an exterior sniff-search by a police K9 at the scene of the traffic stop, and ultimately towed and searched at a nearby fire station.  (See Def. Calixtro-Loya's Mot. to Suppress Evidence from Illegal Search and Seizure, [Docket No. 33]; Def. Pacheco-Rivera's Mot. to Suppress Evidence from Illegal Search and Seizure, [Docket No. 46]).  In support of this request, Defendants argue that

---

[6] Federal Rule of Evidence 404(b) does not extend to evidence of acts which are "intrinsic" to the charged offense. United States v. Adediran, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence; see United States v. Williams, 900 F.2d 823 (5th Cir. 1990).

Trooper Douglas Rauenhorst lacked reasonable, articulable suspicion to extend the July 19, 2022, traffic stop to conduct a K9 sniff-search of the vehicle's exterior.[7]

### A. Statement of Facts[8]

On July 19, 2022, Trooper Douglas Rauenhorst ("Trooper Rauenhorst") with the Minnesota State Patrol was in his marked patrol vehicle traveling westbound on I-94 when he observed a black Toyota Corolla ("the Corolla") traveling eastbound.  (Tr. 13-14).[9]  Trooper Rauenhorst activated his speed radar and ultimately registered the Corolla's speed as traveling at 76 miles per hour in a 70 miles per hour zone.[10]  (Tr. 14).  Trooper Rauenhorst crossed into the eastbound lane near mile marker 175 and activated his patrol lights to initiate a traffic stop of the Corolla.  (Tr. 15; Gov't's Ex. 1, at 00:24-01:14).[11]

After the vehicles came to a stop, Trooper Rauenhorst immediately exited his squad vehicle.  (Gov't's Ex. 1, at 01:15-01:41).  As Trooper Rauenhorst was approaching the passenger door of the Corolla, he saw that the right turn signal remained activated after the Corolla had pulled over and stopped.  (Tr. 16).  Trooper Rauenhorst began speaking with the Corolla's driver, who was later identified as Defendant Pacheco-Rivera; and observed the Corolla's passenger, who was

---

[7] Defendants also initially asserted that, alternatively, even if reasonable, articulable suspicion did exist to extend the traffic stop, Trooper Rauenhorst lacked probable cause to search the vehicle because his canine partner's purported alert during the canine search was insufficient to establish probable cause.  (See Def. Calixtro-Loya's Mot. to Suppress Evidence from Illegal Search and Seizure, [Docket No. 33]; Def. Pacheco-Rivera's Mot. to Suppress Evidence from Illegal Search and Seizure, [Docket No. 46]).  However, Defendants supplemental memorandum in support of the present Motion now only directly challenges whether Trooper Rauenhorst had reasonable, articulable suspicion to prolong the traffic stop to conduct the canine search in the first place.  (Defs.' Mem., [Docket No. 74]).

[8] The facts contained in this section are derived from the testimony of Minnesota State Trooper Douglas Rauenhorst and the Government's exhibit presented in this case.

[9] Throughout this Report and Recommendation, the Court refers to the transcript of the February 16, 2023, Motions Hearing by the abbreviation "Tr." (Transcript, [Docket No. 68]).

[10] At the February 16, 2023, Motions hearing, Trooper Rauenhorst testified that the Corolla also caught his attention because, as the vehicle was passing him on the eastbound lane of I-94, he observed the driver of the Corolla looking back to the right at another Minnesota State Trooper, who was stopped on the right shoulder of the interstate and involved in a separate traffic stop.  (Tr. 14).

[11] Government's Exhibit 1 is a copy of the video from Trooper Rauenhorst's body camera showing the July 19, 2022, traffic stop now at issue.  (Gov't's Ex. 1).  At the Motions Hearing, the Government, without objection, offered the video into evidence as Government's Exhibit 1.  (Tr. 8-9).  Citations to Government's Exhibit 1 are provided in the MM:SS format.

later identified as Defendant Calixtro-Loya.[12]   (Tr. 17-18).   Trooper Rauenhorst explained to Defendant Pacheco-Rivera the reason for the traffic stop and inquired whether she was the owner of the Corolla.  (Tr. 17, 19; Gov't's Ex. 1, at 01:42-01:54).  Defendant Pacheco-Rivera stated that the Corolla belonged to her son, and that she had permission to drive the vehicle.  (Tr. 19, 20; Gov't's Ex. 1, at 01:55-02:07; 02:24-02:26).  Trooper Rauenhorst then asked Defendant Pacheco-Rivera for her driver's license, vehicle registration, and insurance information, and she complied. (Tr. 19).

Trooper Rauenhorst continued to inquire and confirmed that Defendant Pacheco-Rivera's son lived in Oregon, that she still lived in Oregon, and that she had permission to drive the vehicle. (Tr. 22-23; Gov't's Ex. 1, at 02:08-02:30).  Having noted that Defendants were traveling from Oregon, Trooper Rauenhorst later testified that this seemed significant to him because, in his training and experience, the west coast is a source region for drugs being transported to the metropolitan area of Minnesota.  (Tr. 33).

Trooper Rauenhorst then asked Defendants where they were traveling to, and Defendant Pacheco-Rivera stated that they were going to "Minneapolis" and then "Bloomington"; Defendant Pacheco-Rivera also stated that they would be staying there for three days; and that they would be going to the "Mall of America."  (Tr. 20-21; Govt's' Ex. 1, at 02:31-02:55).  This response also seemed significant to Trooper Rauenhorst because, as he later testified, he felt most people who are asked about their destination are more direct.  (Tr. 21-22).

After reviewing her insurance information, the officer asked Defendant Pacheco-Rivera for her son's name, and she responded, "Miguel."  (Gov't's Ex. 1, at 02:56-03:04).

---

[12] The undersigned notes that while the audio recording in Government's Exhibit 1 clearly recorded the voice of Trooper Rauenhorst, Defendants' responsive statements are not so easily understood, as they are recorded at a very low volume and the ambient noise of the wind and passing traffic often overcomes Defendants' statements.

At the February 16, 2023, Motions hearing, Trooper Rauenhorst testified to having made the following additional observations while speaking with Defendant Pacheco-Rivera: the Corolla's transmission was still in "drive"; there was only one key in the ignition; and there were three mobile phones—one mounted on the windshield for directions and two in Defendant Calixtro-Loya's hands. (Tr. 16, 24-25, 32). Trooper Rauenhorst also observed at least one dog in the backseat of the Corolla, along with a dog mat and dog food, and he did not observe any visible luggage. (Tr. 21-22).

Before returning to his patrol vehicle, Trooper Rauenhorst directed Defendant Pacheco-Rivera to shift the Corolla's transmission to "park" so that "it [did not] roll off." (Tr. 16, 32; Gov't Ex. 1, at 03:05-03:15). Trooper Rauenhorst then went back to his patrol vehicle with Defendant Pacheco-Rivera's driver's license and vehicle registration and began preparing a warning citation for speeding. (Tr. 27; Gov't Ex. 1, at 03:16-15:44). Trooper Rauenhorst ultimately determined that the registered owner of the vehicle was an individual named "Carlos Eduardo Tejada Ramirez." (Tr. 27).

Approximately twelve minutes later, Trooper Rauenhorst returned to the Corolla, returned Defendant Pacheco-Rivera's driver's license and vehicle registration, and explained the warning citation to her. (Tr. 27; Gov't Ex. 1, at 15:55-16:12). At the February 16, 2023, Motions hearing, Trooper Rauenhorst testified that the traffic stop was completed upon handing her the warning citation. (Tr. 46-47).

Upon giving Defendant Pacheco-Rivera the warning, Trooper Rauenhorst asked Defendants if there was anything illegal inside of the Corolla, which Defendant Pacheco-Rivera denied. (Tr. 28; Gov't Ex. 1, at 16:12-16:18). Trooper Rauenhorst then asked if it "would be okay" to "run [his] K-9 around the car real quick?" (Gov't Ex. 1, at 16:18-16:24). Trooper Rauenhorst testified that Defendant Pacheco-Rivera consented. (Tr. 28). Although Defendant

Pacheco-Rivera's response is mostly inaudible, from the video recording, it is evident that she responded immediately to the request for consent, and Trooper Rauenhorst's reaction was a congenial, "Ok," and he can then be heard asking Defendants to step out of the Corolla onto the side of the interstate. (Gov't's Ex. 1, at 16:24-16:28). Defendants comply without hesitation, appearing on the body cam video cooperative and friendly. (Id.). Trooper Rauenhorst also can be heard asking Defendants to raise the Corolla's windows to prevent the dog in the backseat from jumping out during the canine search, which Trooper Rauenhorst ultimately did himself by opening the front passenger door of the Corolla, briefly turning the vehicle's ignition on, and raising the front passenger window. (Tr. 30: Gov't's Ex. 1, at 16:25-17:20). As Defendant Calixtro-Loya was exiting the Corolla, Trooper Rauenhorst also asked non-confrontationally for him to place a knife from his front pocket onto the front seat and to leave it in the vehicle; Defendant Calixtro-Loya complied. (Gov't's Ex. 1, at 16:45-17:04). A few seconds later, a second Minnesota State Trooper can be seen standing with Defendants, who were each standing on the grass with their two dogs, while Trooper Rauenhorst returned to his patrol vehicle to retrieve his K9 partner, Frizko. (Tr. 64; Gov't's Ex. 1, at 17:05-17:44).

After leading Frizko to the rear bumper of the Corolla, Trooper Rauenhorst led Frizko counterclockwise to the passenger's side, the front bumper, the driver's side, then back to the rear bumper. (Tr. 30; Gov't's Ex. 1, at 17:45-18:14). At which point, Frizko then "went away from [Trooper Rauenhorst's] lead," and began "sniff[ing] intensely, alerting the odor of drugs, [and] began to go under the underside of the car"; Frizko then "sat and stared for the indication." (Tr. 30, 37, 50; Gov't's Ex. 1, at 18:14-18:30). Trooper Rauenhorst returned Frizko to his patrol vehicle, and began searching the Corolla, including the trunk, the glove compartment, and the hood. (Tr. 50-51; Gov't's Ex. 1, at 18:31-33:59).

Trooper Rauenhorst's roadside search itself did not yield narcotics, but he testified that, at some point, he believed there were narcotics inside of a possible hidden compartment "on the bottom side" of the Corolla.  (Tr. 64, 65).  Specifically, Trooper Rauenhorst and the second officer can be seen inspecting the Corolla's front and back interior, including the floor and floor mats, and commenting that the seats and flooring "just seem[ ] high"; "the seats are loose" and "it looks like it's all been modified."  (Gov't's Ex. 1, at 31:36-33:28; see also 36:13-37:05).  At that point, Trooper Rauenhorst can be heard deciding to "take her in the shop."  (Gov't's Ex. 1, at 33:28-34:07).

Defendants were placed under arrest and were each placed in the rear of a separate patrol vehicle at the scene.  (Tr. 66; Gov't's Ex. 1, at 34:07-34:38).

Approximately four minutes later, a third Minnesota State Trooper can be seen arriving on the scene (Gov't's Ex. 1, at 39:11-39:21).  For the next approximate twenty minutes, Trooper Rauenhorst, along with three other officers, can be seen continuing to search for the hidden compartment in the bottom floor of the Corolla.  (Gov't's Ex. 1, at 39:22-55:51).  A tow truck can then be seen arriving on the scene, and the tow truck driver is heard being directed to tow the Corolla to the Clearwater Fire Department.  (Tr. 64; Gov't's Ex. 1, at 55:24-55:36).

Following behind the tow truck, Trooper Rauenhorst arrived at the Clearwater Fire Department approximately five minutes later.  (Gov't's Ex. 1, at 55:37-59:20).  Trooper Rauenhorst can be heard informing other officers, among other things, his suspicions that the Corolla contained a hidden compartment.  (Gov't's Ex. 1, at 59:21-1:03:27).

At the February 16, 2023, Motions hearing, Trooper Rauenhorst testified that, after cutting the floor mats of the Corolla and removing the seats, a hidden compartment was indeed discovered on the floor of the vehicle which contained approximately seventy (70) pounds of methamphetamine.  (Tr. 69).

16

**B.  Standard of Review**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)); see United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001).

**C.  Analysis**

As an initial matter, Defendants do not challenge the validity of the initial stop of the Corolla for investigation of a speeding violation.  (See Def. Calixtro-Loya's Mot. to Suppress Evidence from Illegal Search and Seizure, [Docket No. 33]; Def. Pacheco-Rivera's Mot. to Suppress Evidence from Illegal Search and Seizure, [Docket No. 46]).  Instead, Defendants contend that the traffic stop was impermissibly prolonged.  In support, and as noted above, Defendants argue that Trooper Rauenhorst did not have reasonable, articulable suspicion to extend the traffic stop beyond the point when the purpose of the initial traffic stop was completed in order to conduct a K9 sniff-search of the Corolla's exterior.  (Defs.' Mem., [Docket No. 74]).  The Government, on the other hand, argues that Trooper Rauenhorst did have reasonable, articulable suspicion to extend the traffic stop by two minutes to conduct the K9 sniff, and in any event, Defendant Pacheco-Rivera consented to said search.  (Gov't Mem., [Docket No. 77]).

It is well established that an officer may conduct an investigation reasonably related to the scope of a lawful stop.  United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). "Once this initial investigation is finished, however, the purpose of the [initial] stop is complete and further detention

of the driver or vehicle would be unreasonable, 'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further [investigatory] detention[.]'" Id. at 925; see United States v. Anguiano, 795 F.3d 873, 876 (8th Cir. 2015).  Without other reasonable and articulable suspicion, police may not extend an otherwise-completed traffic stop. See Rodriguez v. United States, 575 U.S. 348, 353 (2015).

Thus, the Court must determine whether Trooper Rauenhorst had a further reasonable, articulable suspicion to briefly extend the stop by a few minutes, beyond the point when he returned Defendant Pacheco-Rivera's driver's license and gave her the warning citation in order to conduct a K9 sniff-search of the Corolla's exterior.  If Trooper Rauenhorst lacked reasonable, articulable suspicion to expand his scope of the investigation, then the extension of the stop without anything more would be unreasonable.  See, Id. at 353-57 (holding that, absent reasonable suspicion, seven- or eight-minute extension of traffic stop in order to conduct drug sniff violated Fourth Amendment).  However, if Trooper Rauenhorst had reasonable, articulable suspicion to justify expanding his scope of the investigation, the extension of the stop briefly would not violate the Fourth Amendment.  See, e.g., United States v. Maltais, 403 F.3d 550, 556–58 (8th Cir. 2005); United States v. White, 42 F.3d 457, 460 (8th Cir. 1994). "A reasonable suspicion is 'some minimal, objective justification' for suspicion beyond an 'inchoate hunch.'" United States v. Davis, 943 F.3d 1129, 1132 (8th Cir. 2019) (quoting United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004)).

To establish reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" further investigation.  Terry v. Ohio, 392 U.S. 1, 21 (1968).  The concept of reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213 (1983).  Instead, when determining whether reasonable suspicion exists, a Court

must consider the totality of the circumstances. <u>United States v. Woods</u>, 747 F.3d 552, 556 (8th Cir. 2014).

Defendants rely on <u>Rodriguez v. United States</u>, 575 U.S. 348 (2015), and its progeny to support their argument that Trooper Rauenhorst unreasonably extended the initial traffic stop past the point at which he completed the tasks within the scope of his initial stop to conduct a K9 sniff-search of the Corolla's exterior.  (<u>See</u> Defs.' Mem., [Docket No. 74], at pp. 3-4).  In <u>Rodriguez</u>, a canine-paired officer stopped Rodriguez for driving on the shoulder, a traffic violation.  <u>Rodriguez</u>, 575 U.S. at 350-52.  After the officer completed all tasks relating to the basis for the stop, he asked Rodriguez for permission to allow his dog to conduct a sniff-search of the exterior of Rodriguez's vehicle.  <u>Id.</u>  Rodriguez did <u>not</u> consent.  <u>Id.</u>  The officer then detained Rodriguez for an additional seven minutes while he waited for a second officer to arrive, then retrieved his dog and conducted a sniff-search of the exterior of the vehicle, during which the dog indicated the presence of narcotics in the vehicle.  <u>Id.</u>  As a result, Rodriquez was indicted on narcotics charges.  <u>Id.</u>  He later moved to suppress the evidence gathered as a result of the stop.  <u>Id.</u>  The Magistrate Judge recommended that the motion be denied, concluding that although the officer did not have a reasonable articulable suspicion on which to prolong the stop after completing all tasks related to the initial stop, the seven-minute extension of the stop was a <u>de minimis</u> intrusion on Rodriguez's Fourth Amendment rights.  <u>Id.</u>  The District Court and the Eighth Circuit agreed.  <u>Id.</u> at 352-53.  However, the Supreme Court reversed holding that the officer had been required to have a separate reasonable, articulable suspicion of criminal activity before he could extend the stop past the point at which he had completed all tasks related to the scope of the initial traffic stop.  <u>Id.</u>  The present case is controlled by <u>Rodriguez</u> and the Eighth Circuit Court of Appeals cases applying <u>Rodriguez</u>.

Applying this controlling precedent to the facts of this case, the Court finds that, on the scene of the July 19, 2022, traffic stop of the Corolla, Trooper Rauenhorst <u>lacked</u> any independent

reasonable, articulable suspicion to briefly extend the traffic stop beyond the moment in time when he completed the actions necessary within the scope of his initial traffic stop for speeding so that he could conduct a K9 sniff-search of the Corolla's exterior.

At the February 16, 2023, Motions hearing, Trooper Rauenhorst articulated the following observations that he thought to be suggestive of criminal activity. Defendant Pacheco-Rivera appeared nervous because the Corolla's transmission remained in "drive" and the right turn signal remained activated after initially pulling over to the shoulder. He also observed three mobile phones in the vehicle—one mobile phone on the windshield, and two mobile phones being held by the passenger, Defendant Calixtro-Loya. Further, Trooper Rauenhorst testified that he found it important that there was only a single key in the ignition because, in his experience, past vehicles with "drug loads in hidden compartments . . . are only used to transport drugs" and have "no house keys, no anything. Just the ignition key in the ignition." (Tr. 24). Defendant Pacheco-Rivera saying first that they were going to Minneapolis and then saying Bloomington and the Mall of America also caught Trooper Rauenhorst's attention. (Tr. 21). The presence of at least one dog in the backseat raised doubt for the Trooper on Defendants' destination of the "Mall of America" because, according to Trooper Rauenhorst, dogs are not allowed inside of the mall, and he felt the day was too hot for Defendants to leave the dogs inside of the vehicle while they visited the shopping center. (Tr. 21-22). Trooper Rauenhorst also found it significant that Defendants were traveling from Oregon to "the Twin Cities Area" because, in his training and experience, the west coast is a source region for drugs and drug supplies transported "daily" to Minneapolis. (Tr. 33). Lastly, Trooper Rauenhorst saw no visible luggage in the backseat of the Corolla, which he would have expected to see in small vehicle making a long trip "across the country." (Tr. 43).

Trooper Rauenhorst acknowledged at the February 16, 2023, Motions hearing that the purpose of the July 19, 2022, traffic stop had been completed at the point in time when he gave

Defendant Pacheco-Rivera a warning citation for speeding and returned her driver's license.  See generally United States v. Beck, 140 F.3d 1129, 1132-36 (8th Cir. 1998) (finding that the traffic stop was complete because the officer had returned the driver's license and registration, issued a verbal warning, and told the defendant he was free to go).  Therefore, to extend the stop past this point to deploy his K9 partner, Frizko, even by mere minutes, Trooper Rauenhorst would have needed an additional, separate reasonably articulable factual basis upon which to believe a different offense was in need of further investigation.  See Rodriguez, 575 U.S. at 353.

No such separate reasonable, articulable suspicion existed here—even considered in their totality.

Turning first to Trooper Rauenhorst's contention that Defendant Pacheco-Rivera appeared nervous because the Corolla's right turn signal was still activated and the vehicle's transmission was still in "drive" after the Corolla had pulled over to the shoulder, while nervousness can be a pertinent factor in determining the existence of reasonable suspicion, see United States v. Quinn, 812 F.3d 694, 699 (8th Cir. 2016), the Eighth Circuit has also noted that "[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer."  See Beck, 140 F.3d at 1139.  Here, Trooper Rauenhorst did not testify as to whether Defendants appeared any more nervous than the average individual experiencing a traffic stop, and the Court's review of the body camera footage does not appear to show Defendants displaying any unusual degree of nervousness beyond that which might be expected with any traffic stop.

The Court also finds nothing inherently suspicious about there being three mobile phones in the Corolla.  Today, smart phones are relatively affordable and ubiquitous, and many individuals choose to carry multiple electronic devices—i.e., separate cell phones for work use and personal use, or for various other equally innocent reasons.  Indeed, Trooper Rauenhorst testified that one

mobile phone was attached to the windshield for directions and two others were being held by Defendant Calixtro-Loya—one of which could have belonged to Defendant Pacheco-Rivera.[13] Similarly, Trooper Rauenhorst's observation of no luggage in the backseat of the Corolla does not in and of itself reasonably give rise to suspicion of criminal activity. Having luggage in the trunk of a vehicle instead of inside the passenger compartment is eminently reasonable and actually advisable while traveling. Beck, 140 F.3d at 1139. The undersigned further notes that traveling with dogs in a vehicle to a location where dogs are not allowed, regardless of the inconvenience as perceived by law enforcement, is also not in and of itself an inherently suspicious activity. See in accord Beck, 140 F.3d at 1138 ("[T]he mere presence of fast-food wrappers in [a vehicle] is entirely consistent with innocent travel such that, in the absence of contradictory information, it cannot reasonably be said to give rise to suspicion of criminal activity.").

Lastly, to the extent Trooper Rauenhorst was concerned that Defendants were driving from Oregon to the metropolitan area of Minnesota, the undersigned notes that the Eighth Circuit has held that the origin and destination of travel, while not entirely irrelevant, are not a dispositive genesis for reasonable suspicion of criminal activity. See Beck, 140 F.3d at 1137-38 (noting that geography could be relevant, but also collecting cases stating that origin of traveler or package from a "known drug center" or a "'drug source' city" was inadequate to support reasonable suspicion of criminal activity).

In sum, at the time the initial traffic stop for speeding had been completed, Trooper Rauenhorst did not have an independent reasonable, articulable suspicion of other criminal activity to extend the stop beyond that point to deploy his K9, Frisko. However, this does not end the Court's analysis.

---

[13] The undersigned Magistrate Judge notes that he himself has both a work cell phone and a personal cell phone.

While the Court's conclusion would warrant the suppression of the evidence seized during the subsequent search of the Corolla if there was nothing more to consider, the Court is now squarely confronted with the question of whether the K-9 sniff-search of the Corolla's exterior was separately justified by Defendant Pacheco-Rivera's consent.

"Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to search is a well-recognized exception to the warrant requirement." United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010). "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." United States v. Pennington, 287 F.3d 739, 746 (8th Cir.2002) (internal quotations omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." United States v. Williams, 521 F.3d 902, 906 (8th Cir. 2008).

Importantly, consent must be voluntarily given. The determination of whether consent is voluntary, or was the product of duress or coercion, is a question of fact to be determined from the totality of the circumstances. Schneckloth, 412 U.S. at 227. The issue of consent does not turn on the defendant's subjective state of mind, but whether the officer reasonably believed the defendant consented. Garcia-Garcia, 957 F.3d at 892; see also Jones, 254 F.3d at 695 (observing that the question is "not whether [Defendant] consented subjectively, but whether [their] conduct would have caused a reasonable person to believe that [they] consented."). A defendant's consent will be deemed voluntary if the Government demonstrates a reasonable person would have believed the subject of the search gave consent that was the product of an essentially free and unconstrained choice. United States v. Cedano-Medina, 366 F.3d 682, 688 (8th Cir. 2004).

The Eighth Circuit has recognized several factors that must be considered in determining whether consent was given voluntarily, which include:

[P]ersonal characteristics of the defendant, such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the defendant and police preceding the consent, whether the defendant was free to leave or was subject to restraint, and whether the defendant's contemporaneous reaction to the search was consistent with consent.

Jones, 254 F.3d at 696; see also United States v. Correa, 641 F.3d 961, 966-67 (8th Cir. 2011).

Courts have previously grouped these factors into three categories: (1) the nature of the interaction between police and the defendant, (2) the personal characteristics and behavior of the defendant, and (3) the environment surrounding the defendant at the time they gave their consent. Garcia-Garcia, 957 F.3d at 897.

Here, at the point where Trooper Rauenhorst returns to the Corolla to issue Defendant Pacheco-Rivera a warning citation for speeding, the body camera appears to have only captured the front passenger door while Trooper Rauenhorst can be heard explaining the warning to Defendant Pacheco-Rivera. Trooper Rauenhorst can then be heard immediately thereafter asking if there was anything illegal inside of the Corolla and whether it "would be okay" to "run [his] K-9 around the car real quick?" (Gov't Ex. 1, at 16:18-16:24). The audio does not capture Defendant Pacheco-Rivera's statement of consent because of the ambient noise of the wind and passing traffic. However, Trooper Rauenhorst testified that she did in fact consent to the K9 search of the vehicle's exterior. Indeed, the audio and video shows Trooper Rauenhorst's reaction to Defendant Pacheco-Rivera's response to the request for consent to be calm, relaxed, and non-confrontational. (Gov't Ex. 1, at 16:24-17:20).

The Court finds that Trooper Rauenhorst and the Defendants' visibly and collective calm and cooperative demeanor, along with Defendants' readily cooperative conduct of stepping out the vehicle without protest, reasonably suggests the voluntariness of Defendants consent to the canine search of the exterior of the Corolla. See United States v. Gleason, 25 F.3d 605, 607 (8th Cir.

1994) (holding that consent may properly be inferred from the conduct and demeanor of the consenting person during the search, including such things as friendly behavior or a lack of hostility, or "chatting" with the officer or others present).   Indeed, the audio and video evidence in the record shows the K9 sniff of the vehicle's exterior was conducted on a public road in full view of other passing vehicles, while Defendants and their dogs calmly stood aside on the grass chatting with another officer.  Further, as the driver of the vehicle, Defendant Pacheco-Rivera had adequate authority to consent to the search, and there is no evidence that Trooper Rauenhorst applied any threats, intimidation, promises, or misrepresentations to coercively obtain Defendant Pacheco-Rivera's consent.

Therefore, under the totality of the circumstances, Defendants' own conduct and characteristics are clearly indicative of the voluntariness of the consent.  Accordingly, because the Court finds that Defendant Pacheco-Rivera's consent to a K9 sniff-search of the Corolla's exterior was voluntarily made, Trooper Rauenhorst was entitled to conduct said search of the vehicle, even without a warrant.

A few minutes after Trooper Rauenhorst deployed his canine partner, Frizko gave a positive indication that there were narcotics present in the Corolla, which then supplied Trooper Rauenhorst with probable cause to further seize and search the Corolla at the scene of the July 19, 2022, traffic stop and at the local fire department, without a warrant.[14]  As the Eighth Circuit Court of Appeals has explained, "[a]ssuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there

---

[14]"[T]he 'automobile exception' permits the warrantless search of a vehicle if the police 'had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began.'"  United States v. Vore, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003)). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005). In making the probable cause determination, Courts "apply a common sense approach and consider all relevant circumstances." Id.; see United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003).

are drugs present." <u>United States v. Donnelly</u>, 475 F.3d 946, 955 (8th Cir. 2007) (citing <u>United States v. Sundby</u>, 186 F.3d 873, 875-76 (8th Cir. 1999)). Defendants do not now challenge the reliability of K9 officer Frizko's alert during the sniff-search of the exterior of the Corolla, and there is nothing in the record to suggest that Frizko's alert was insufficient to establish the probable cause necessary to further search the Corolla at the June 19, 2022, traffic stop and at the local fire department pursuant to the "automobile exception" to the warrant requirement of the Fourth Amendment.

Accordingly, the undersigned recommends that Defendant Calixtro-Loya's Motion to Suppress Evidence from Illegal Search and Seizure, [Docket No. 33], and Defendant Pacheco-Rivera's Motion to Suppress Evidence from Illegal Search and Seizure, [Docket No. 46], both be **DENIED**.

## VIII. Conclusion

Thus, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. Government's Motion for Discovery for Defendants Calixtro-Loya and Pacheco-Rivera, [Docket No. 5], is **GRANTED**, as set forth above;

2. Defendant Calixtro-Loya's Motion for Early Disclosure of Jencks Act Materials, [Docket No. 34], is **DENIED**, as set forth above;

3. Defendant Calixtro-Loya's Motion to Retain Rough Notes, [Docket No. 35], is **GRANTED**, as set forth above;

4. Defendant Calixtro-Loya's Motion for Discovery, [Docket No. 36], is **GRANTED, in part, and DENIED, in part**, as set forth above;

5. Defendant Calixtro-Loya's Motion for Disclosure of Rule 404(b) Evidence, [Docket No. 37], is **GRANTED**, as set forth above;

6.  Defendant Pacheco-Rivera's Motion for Discovery, [Docket No. 42], is **GRANTED, in part, and DENIED, in part**, as set forth above;

7.  Defendant Pacheco-Rivera's Motion for Disclosure of Rule 404(b) Evidence, [Docket No. 43], is **GRANTED**, as set forth above;

8.  Defendant Pacheco-Rivera's Motion for Early Disclosure of Jencks Act Materials, [Docket No. 44], is **DENIED**, as set forth above; and

9.  Defendant Pacheco-Rivera's Motion to Retain Rough Notes, [Docket No. 45], is **GRANTED**, as set forth above.

Further, **IT IS HEREBY RECOMMENDED THAT**:

10. Defendant Calixtro-Loya Motion to Suppress Evidence from Illegal Search and Seizure, [Docket No. 33], be **DENIED**; and

11. Defendant Pacheco-Rivera's Motions to Suppress Evidence from Illegal Search and Seizure, [Docket No. 46], be **DENIED**.

Dated: May 22, 2023

s/Leo I. Brisbois
Hon. Leo I. Brisbois
U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.